Matter of LaRocca (2024 NY Slip Op 06341)

Matter of LaRocca

2024 NY Slip Op 06341

Decided on December 18, 2024

Appellate Division, Second Department

Per Curiam.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on December 18, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
MARK C. DILLON
COLLEEN D. DUFFY
BETSY BARROS
CHERYL E. CHAMBERS, JJ.

2022-00722

[*1]In the Matter of Marco LaRocca, an attorney and counselor-at-law. Grievance Committee for the Tenth Judicial District, petitioner; Marco Larocca, respondent. (Attorney Registration No. 4151353)

DISCIPLINARY PROCEEDING instituted by the Grievance Committee for the Tenth Judicial District. The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on September 17, 2003.

Catherine A. Sheridan, Hauppauge, NY (Stacey J. Sharpelletti of counsel), for petitioner.
Egan & Golden, LLP, Patchogue, NY (Harvey B. Besunder of counsel), for respondent.

PER CURIAM.

OPINION & ORDER
The Grievance Committee for the Tenth Judicial District commenced a formal disciplinary proceeding against the respondent by serving and filing a notice of petition and a verified petition, both dated June 21, 2022. The respondent, through counsel, served and filed a verified answer dated July 7, 2022, admitting to some of the factual allegations contained in the petition but denying the conclusions of law contained therein. By order dated October 13, 2022, the matter was referred to the Honorable Peter B. Skelos, as Special Referee, to hear and report. A prehearing conference was conducted on November 16, 2022. By stipulation dated December 9, 2022, the parties agreed to: (1) amend the petition to correct typographical errors; (2) amend the answer to admit to certain facts; and (3) stipulate that there were no disputed facts relevant to charges one through five of the petition as amended, and that the only issues in dispute were the conclusions of law and whether the respondent violated the Rules of Professional Conduct. The hearing was conducted on January 4, 2023. In a report dated May 4, 2023, the Special Referee sustained charges one through four, and charge five, in part. The Grievance Committee now moves to: (1) confirm the Special Referee's report insofar as it sustained charges one through four of the amended petition, and charge five, in part; (2) disaffirm the Special Referee's report insofar as it did not sustain a part of charge five; and (3) impose such discipline as this Court deems just and proper. The respondent cross-moves to: (1) confirm the Special Referee's report insofar as it did not sustain a part of charge five; (2) disaffirm the Special Referee's report insofar as it sustained charge five, in part; and (3) impose a public or private admonition, or alternatively a censure, with respect to the charges which are sustained. In view of the evidence adduced at the hearing and the admissions, we find the Special Referee properly sustained charges one through four, and those charges are sustained. However, we find that the Special Referee improperly failed to fully sustain charge five, and charge five is sustained in full.
The Amended Petition and Amended Answer
The amended petition contains five charges of misconduct related to the respondent's [*2]escrow accounts. The respondent maintained and was the sole signatory for an attorney trust account at Citibank titled "MARCO LAROCCA ESQ Attorney Trust" with an account number ending in 9921 (hereinafter the subject account). Since approximately 2008, the respondent has acted as a settlement agent for United Northern Mortgage Bank (hereinafter UNMB), a mortgage lender. The respondent used the subject account for UNMB real estate closings.
Charge one, as amended, and charge two allege that the respondent misappropriated funds entrusted to him as a fiduciary incident to his practice of law, in violation of rule 1.15(a) of the Rules of Professional Conduct (22 NYCRR 1200.0).
Regarding charge one, as of March 6, 2018, the respondent was required to maintain
at least $8,413 on deposit in the subject account for seven mortgage matters in which he represented UNMB. On that date, however, the balance in the subject account was $7,435, which was $977.65 below the amount that the respondent was required to maintain in connection with those matters.
On March 7, 2018, the sum of $316,513.19 was deposited into the subject account in connection with a UNMB real estate matter for Cabrera (hereinafter the Cabrera matter). On March 8, 2018, after disbursement of funds for the Cabrera matter and other mortgage matters, the subject account balance was $267,593.24 at the end of the day. On that date, the respondent was required to maintain at least $267,330.89 in the subject account for the Cabrera matter. On March 9, 2018 (without further deposit of funds), 14 checks totaling $268,430.89 were presented for payment against the subject account. Of those checks, 1 check in the sum of $257,585.15 that was issued in the Cabrera matter was dishonored due to insufficient funds, and 9 checks totaling $1,350, made payable to the respondent, were negotiated against the subject account.
As to charge two, on April 23, 2018, the subject account balance was $60,495.22, when the respondent was required to maintain at least $74,163.66 in the subject account for eight mortgage matters (a $13,668.44 deficit).
Charge three alleges that the respondent engaged in conduct adversely reflecting on
his fitness as a lawyer, in violation of rule 8.4(h) of the Rules of Professional Conduct, in that from at least January 2014, up to and including June 2018, he failed to regularly reconcile the subject account.
Charge four, as amended, alleges that from at least January 2014 up to and including June 2018, the respondent failed to consistently make accurate and contemporaneous ledger entries of financial transactions occurring in the subject account, in violation of rule 1.15(d)(2) of the Rules of Professional Conduct.
Charge five alleges that the respondent failed to title his attorney trust accounts as
required by rule 1.15(b)(2) of the Rules of Professional Conduct, in that the subject trust account is titled "MARCO LAROCCA ESQ Attorney Trust." The respondent also maintained an IOLA account at Bank of America (hereinafter BOA) with an account number ending in 0374, titled "NY IOLA TRUST ACCT MARCO LAROCCA ESQ," with checks titled "NY IOLA TRUST, MARCO LAROCCA ESQ," and deposit slips titled "MARCO LAROCCA ESQ., IOLA ACCOUNT," all of which failed to comply with rule 1.15(b)(2) of the Rules of Professional Conduct.
The factual allegations as set forth above were admitted by the respondent.
The Hearing and the Hearing Record
The respondent testified that at the end of 2004 or in early 2005, a few years after he graduated from law school, he opened a solo practice and concentrated on real estate closings. The respondent opened an escrow account at BOA (hereinafter the BOA escrow account) when he started his solo practice. In 2012, the respondent opened the subject account at Citibank specifically for his representation of UNMB. After opening the subject account, the BOA escrow account was used strictly in connection with the respondent's representation of buyers or sellers in real estate transactions, and the subject account at Citibank was used strictly for UNMB closings. Since 2012, UNMB was the only bank that the respondent represented, and it comprised approximately 80% of the business of the respondent's law firm. Initially, the respondent completed approximately 20 closings per month for UNMB. That volume grew to 30 to 40 closings per month, and as of 2020, the respondent was averaging approximately 40 closings per month. Besides real estate closings, the respondent also represented landlords in eviction matters.
According to the respondent, about once a week or once every two weeks, after he had completed the real estate closings and was "a little bit free," he would enter the transactions into Quickbooks based on the information in his check stubs and attempt to reconcile the subject account. The respondent testified that the purpose of entering the transactions into Quickbooks was so that [*3]he could find a specific check if a question subsequently arose. The respondent received monthly bank statements and it was aspirational for him to review the statements monthly. His "reconciliation" consisted of reviewing the checks that were cashed or not cashed. The respondent never noticed that bank fees were being charged from his subject account (for more than five years).
On March 12, 2018, a check in the sum of $257,585.15 issued at the Cabrera closing on March 7, 2018, was dishonored due to a $837.65 shortfall in the subject account (hereinafter the first dishonored check). The respondent learned of the first dishonored check when he received a telephone call from the seller's attorney. The respondent testified that he immediately reviewed all the checks from the Cabrera closing and found no mistakes in the amount of funds that were distributed. However, in order to quickly pay off the seller's mortgage so that there was no additional per diem interest charged, on March 14, 2018, the respondent made two deposits of $100 and $1,000, respectively, into the subject account. The respondent also wired the sum of $257,585.15 to the proper recipient.
At his examination under oath (hereinafter EUO), the Grievance Committee asked the respondent why he made two deposits on the same day. The respondent initially claimed it was because he had two checks issued to him from previous closings and he decided to use those checks to cover the shortfall. However, the respondent's bank records indicate that he deposited cash on two different occasions on the same day. The respondent testified that he could not recall why he made two separate cash deposits. The respondent explained that he generally obtained a cashier's check for payments in a large amount, and in that process, the bank teller would inform him if he did not have sufficient funds in the subject account. On the day of the closing of the Cabrera matter, the respondent testified that he recalled that there was an ice or snow storm and Citibank was not open. Therefore, the respondent issued a check from the subject account directly to the seller. The respondent testified at his EOU that after this incident, he became worried about the subject account and upon closer examination, he realized that Citibank was deducting banks fees from the subject account, causing the shortfalls. At the hearing, the respondent admitted that it was an accountant who had alerted the respondent to the bank fees after the accountant reconciled the subject account. Thus, despite the bank fees being listed on the bank statements for years, the respondent was still unaware of the bank fees for months after one of his checks was dishonored.
The record indicates that since December 2013, Citibank deducted funds from the subject account to pay the respondent's wire fees, which resulted in client funds being used to pay bank charges. Thus, approximately four years prior to the dishonored check, the respondent had a continuous shortage in the subject account, which he failed to detect. Specifically, between January 25, 2013, and December 21, 2016, Citibank charged a total of $1,123 in fees in 25 instances for transactions in the subject account, and the respondent paid only $506 of the fees in 9 instances, causing a $617 deficit. In 2017, Citibank charged a total of $1,454 in fees in 28 instances, two of which were for returned checks. In 2017, the respondent paid at total of only $493 in fees in 9 instances, causing an aggregate $961 deficit in the subject account. In 2018, Citibank charged a total of $1,815 in fees in 28 instances, and the respondent paid a total of $1,315 in fees in 19 instances. On March 14, 2018, the respondent deposited the total sum of $1,100 into the subject account to cover the shortage that caused the first dishonored check. Even with this deposit, the subject account was still $978 short due to the bank fees by the end of 2018, nine months after the first dishonored check. In October 2019, Citibank reversed all the fees charged and deposited the sum of $4,722 into the subject account.
The respondent testified that he was not aware that Citibank was charging bank fees because his understanding was that banks "should never charge any bank fees on an attorney IOLA account." However, when confronted with the fee chart that he submitted to the Grievance Committee listing all the fees that Citibank had charged, including some fees that were paid contemporaneously with wire transfers, the respondent admitted that those fees were paid in cash when the teller advised him of the fee. If the bank teller did not inform the respondent that there was a fee, he assumed there was no fee to be paid. The respondent testified that he reviewed his bank statements monthly, but he did not see the bank fee deductions for the six years that he maintained the subject account prior to the dishonored checks.
While the respondent blames bank fees for the shortfalls, the record indicates that bank fees do not fully explain the deficiencies in the subject account. On June 5, 2018, a check issued on June 4, 2018, in the sum of $450, made payable to UNMB, was dishonored (hereinafter the second dishonored check). The balance of the subject account on June 5, 2018, was $171.46. [*4]In a submission to the Grievance Committee, the respondent claimed that the second check was dishonored because UNMB "accidentally shorted the wire for $450, and they were going to reimburse me the $450, or hold on to the check, and return [it] to me. One of the employees from the accounting department was not made aware of this situation and deposited the check. I am waiting [until] after the internal audit is completed to confirm that this was the reason behind the shortage."
The Grievance Committee conducted its own reconciliation and did not find a wire shortage for the relevant transaction. The Grievance Committee informed the respondent that his explanation of the second dishonored check was "vague and insufficient" and asked for supporting documentation. In response, the respondent acknowledged the Grievance Committee's "feeling" regarding his explanation, but failed to provide more information to support his assertion regarding the cause of the second dishonored check. The respondent informed the Grievance Committee that after his accountant's reconciliation of the subject account, it was discovered that from 2013 until June 24, 2019, Citibank imposed a total of $4,722 in wire fees, some of which the respondent had paid, and many of which had been deducted from the subject account, thereby invading client/third-party funds prior to the respondent depositing the total sum of $1,100 on March 14, 2018, to cover the shortage that caused the first dishonored check. The respondent did not amend his explanation regarding the second dishonored check, and in an affirmation to the Grievance Committee dated May 26, 2021, continued to assert that an error by UNMB caused the second dishonored check.
At his EUO, the respondent was asked about his repeated inaccurate assertions to the
Grievance Committee that the second dishonored check was the fault of UNMB. The respondent explained that there were errors made by UNMB in the past and "it just got stuck in [his] head" that those errors were the cause of the second dishonored check. At the time of his EUO, three years after the second check was dishonored, the respondent still had not replaced the second dishonored check to UNMB, but stated that he would do so immediately after the EUO. The respondent issued the replacement check approximately one month after his EUO.
The record also shows that in another real estate transaction, the respondent over-disbursed the sum of $20,000 from the subject account to the seller, Donna A. Russell. In his initial submissions to the Grievance Committee, the respondent repeatedly blamed this error on Citibank and claimed that the bank resolved the error by "crediting" the sum of $20,000 to the subject account. The closing with Russell occurred on April 17, 2018, and the respondent testified that he learned of the overpayment when the seller's attorney called him at the end of April 2018 to report the over-disbursement. The parties agreed that in order to expedite the availability of the funds, Russell, who had her funds at a BOA account, would deposit a check in the sum of $20,000 into the respondent's BOA escrow account, and the respondent would wire the funds from the BOA escrow account to the subject account. The respondent stated that after he was informed that Russell went to the bank on May 1, 2018, he wired the sum of $20,000 from the BOA escrow account to the subject account without first verifying that the funds were available. The respondent insisted that although he did not personally verify the transaction, he was informed that the Russell funds were deposited into the BOA escrow account. A review of the records for the respondent's BOA escrow account indicates that on May 1, 2018, a wire transfer in ths sum of $20,000 was effectuated from the BOA escrow account to the subject account, but that Russell's check in the sum of $20,000, endorsed by the respondent, was not deposited until May 7, 2018. Therefore, the funds were not deposited into the BOA escrow account on May 1, 2018, as the respondent claimed.
The hearing record demonstrates that the respondent made additional errors concerning the subject account, which he did not rectify until after the Grievance Committee's investigation, such as over-disbursing approximately $1,000 to a seller in a real estate transaction without realizing the error for approximately one year, and allowing third-party funds to remain in the subject account for approximately three years.
The respondent submitted that around the time of the over-disbursements, his wife was undergoing surgeries and he was caring for their two children. However, the respondent had never fully reconciled the subject account with the bank statements, and was instead "eyeballing" the statements. The respondent has since changed his practice to limit his real estate closings to four per day, hired more employees, and taken remedial measures to oversee and reconcile the subject account.
The Grievance Committee moves to: (1) confirm the Special Referee's report insofar as it sustained charges one through four of the amended petition, and that part of charge five which [*5]alleges that the respondent's BOA escrow account was not properly titled in accord with rule 1.15(b)(2) of the Rules of Professional Conduct; (2) disaffirm the Special Referee's report insofar as it did not sustain that part of charge five which relates to the titling of the subject account at Citibank; and (3) impose such discipline as this Court deems just and proper. Regarding charge five, the Grievance Committee submits that rule 1.15(b)(2) of the Rules of Professional Conduct specifically requires special bank accounts to have the title "Attorney Special Account," "Attorney Trust Account," or "Attorney Escrow Account." As such, the title of only "Attorney Trust" was in violation of rule 1.15(b)(2) of the Rules of Professional Conduct.
The respondent cross-moves to: (1) confirm the Special Referee's report insofar as it did not sustain a part of charge five; (2) disaffirm the Special Referee's report insofar as it sustained a part of charge five; and (3) impose a public or private admonition or alternatively a censure with respect to the charges that are sustained. The respondent argues, inter alia, that a private sanction should be imposed because he was improperly charged wire fees by Citibank and that a public sanction would not enhance the perception of the profession or serve to protect the public. Given the remedial measures taken, the respondent contends that there is no danger of future escrow account failures. The respondent further contends that "[t]he problem" occurred during a finite period from March 2018 to June 2018, while the respondent's wife was undergoing surgeries and the respondent had additional parental responsibilities.
In its affirmation in further support of its motion and in response to the respondent's
cross-motion, the Grievance Committee contends that the title of the subject account at Citibank,
while concededly close, was in violation of the rule 1.15(b)(2) of the Rules of Professional Conduct. Compliance with the "spirit of the Rule," as the respondent argues, is insufficient, since the rule states that a lawyer "shall" identify the special bank account or accounts as "Attorney Special Account," "Attorney Trust Account," or "Attorney Escrow Account." The Grievance Committee also submits that the respondent's contention that a private sanction be imposed because his misconduct occurred over "a very finite period of a few months" is not fully accurate. While the two checks issued against the subject account were dishonored on March 9, 2018, and June 5, 2018, respectively, the respondent's over-disbursement of approximately $1,000 in connection with a real estate transaction occurred in April 2018, and he did not realize his mistake until approximately one year later when his accountant reconciled the subject account. The respondent also over-disbursed the sum of $20,000 to a seller and only realized that he had done so after he was notified by the seller's attorney. Furthermore, the first dishonored check in March 2018 was the result of an ongoing and growing deficit, which began in December 2013 when the bank was withdrawing fees, which the respondent failed to notice for years. The Grievance Committee submits that these factors demonstrate an underlying and long-standing problem resulting from the respondent's ongoing failure to maintain accurate escrow records and the respondent's failure to reconcile his escrow accounts, which occurred for more than "a very finite period of a few months."
Lastly, the Grievance Committee contends that "it is far from clear" that Citibank charged the fees in error, since the respondent testified that one of his remedial measures was to open an operating account with Citibank to avoid future fees. If the fees were improperly charged, there would be no need to open another account to avoid them. Moreover, not all of the fees charged to the subject account were wire fees. Some fees were for dishonored checks, as noted by the respondent's own accountant.
Findings and Conclusion
In view of the evidence adduced at the hearing and the respondent's admissions, we find that the Special Referee properly sustained charges one through four in the petition and those charges are sustained. However, we find that while the Special Referee properly sustained charge five, in part, he improperly failed to fully sustain charge five, and charge five is fully sustained as the titling of the subject account at Citibank failed to comply with rule 1.15(b)(2) of the Rules of Professional Conduct. Accordingly, the Grievance Committee's motion is granted in its entirety. The respondent's cross-motion is denied. Rule 1.15(b)(2) of the Rules of Professional Conduct states that a lawyer "shall" identify the special bank account by one of the three quoted titles of "Attorney Special Account," "Attorney Trust Account," or "Attorney Escrow Account." Should any other version be allowed, the designated titles would not be in quotes.
In determining an appropriate measure of discipline, we have considered in mitigation, inter alia, the lack of evidence of venal intent, the evidence of the respondent's positive character, and the remedial measures implemented by the respondent to properly maintain his escrow accounts. Notwithstanding the mitigation advanced, we find that the respondent failed to honor his [*6]fiduciary obligations for years, which resulted in the misappropriation of fiduciary funds and an escrow account deficiency for an extended period. The respondent also repeatedly misrepresented the circumstances of his misconduct and attributed the blame for his misconduct to others.
Under the totality of the circumstances, we find that the respondent's conduct warrants his suspension from the practice of law for a period of two years (see Matter of Laurencell, 198 AD3d 45).
LASALLE, P.J., DILLON, DUFFY, BARROS AND CHAMBERS, JJ., concur.
ORDERED that the Grievance Committee's motion to confirm the Special Referee's report insofar as it sustained charges one through four of the amended petition, and charge five, in part, and disaffirm the Special Referee's report insofar as it did not sustain a part of charge five, is granted, and the respondent's cross-motion is denied; and it is further,
ORDERED that the respondent, Marco LaRocca, is suspended from the practice of
law for a period of two years, commencing January 17, 2025, and continuing until further order of this Court. The respondent shall not apply for reinstatement earlier than July 17, 2026. In such application (see 22 NYCRR 1240.16), the respondent shall furnish satisfactory proof that during the period of suspension, he (1) refrained from practicing or attempting to practice law, (2) fully complied with this opinion and order and with the terms and provisions of the rules governing the conduct of disbarred or suspended attorneys (see id. § 1240.15), (3) complied with the applicable continuing legal education requirements of 22 NYCRR 691.11(a), and (4) otherwise properly conducted himself; and it is further,
ORDERED that during the period of suspension and until further order of this Court, the respondent, Marco LaRocca, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, during the period of suspension and until the further order of this Court, the respondent, Marco LaRocca, shall desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, Marco LaRocca, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Darrell M. Joseph
Clerk of the Court